**UNITED STATES of America,**
**Appellee,**

v.

**Joseph COVELLO, Appellant.**

**No. 322, Docket 31293.**

United States Court of Appeals
Second Circuit.

Argued Feb. 8, 1968.

Decided March 24, 1969.

Final Arguments by Briefs
Sept. 23, 1968.

3. *Cf.* Note, The Interest in Rootedness: Family Relocation and an Approach to Full Indemnity, 21 Stan.L.Rev. 801, 869–72 (1969).

538

Robert G. Morvillo, John E. Sprizzo, Asst. U. S. Attys., Robert M. Morgenthau, U. S. Atty., for appellee.

Robert L. Weinberg, Edward Bennett Williams, Vincent J. Fuller, Williams & Connolly, Washington, D. C., for appellant.

Before WATERMAN and FEINBERG, Circuit Judges, and BARTELS, District Judge.[*]

WATERMAN, Circuit Judge:

Joseph Covello having been found guilty after a jury trial in the United States District Court for the Southern District of New York appeals from the judgment of conviction entered upon the verdict. He was indicted on nineteen counts,[1] was found guilty on counts 1 through 6, on count 17 and on count 19, and was acquitted by the jurors on each of the remaining eleven counts. We affirm the judgment of conviction.

Count 1 charged appellant Covello and codefendants Thomas Molinaro, Armando Restaino and Anthony Nappi with a conspiracy in violation of 18 U.S.C. § 371 [2]

[*] Of the Eastern District of New York, sitting by designation.

1. This indictment filed February 19, 1965 superseded a prior one from which it does not differ except for the addition of Anthony Nappi as a codefendant in count 1.

2. § 371. Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the con-

to violate federal interstate gambling statutes, 18 U.S.C. § 1084 [3] and 18 U.S.C. § 1952.[4]

Counts 2 through 6 charged appellant Covello with using interstate telephone facilities between New York and New Jersey in violation of 18 U.S.C. § 1084. Counts 7 through 11 charged Covello and Molinaro, and counts 12 through 16 charged Covello and Restaino, with similar violations of § 1084.

Counts 17 through 19 charged appellant Covello and Molinaro with violation of 18 U.S.C. § 1952 for allegedly traveling in interstate commerce between New Jersey and New York to conduct a business enterprise involving gambling in violation of a New Jersey statute prohibiting bookmaking.

Covello was sentenced to concurrent sentences of three years imprisonment on count 1, two years imprisonment on each of counts 2 through 6, and three years imprisonment on each of counts 17 and 19.[5]

---

3. § 1084. Transmission of wagering information; penalties

(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

(b) Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State where betting on that sporting event or contest is legal into a State in which such betting is legal.

(c) Nothing contained in this section shall create immunity from criminal prosecution under any laws of any State, Commonwealth of Puerto Rico, territory, possession, or the District of Columbia.

4. § 1952, in pertinent part, reads as follows:

§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

spiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

\* \* \* \* \*

5. Defendant Nappi was acquitted by the court at the close of the government case. The issues as to the guilt of the other defendants on all nineteen of the counts charged in the indictment were submitted to the jury for resolution. Molinaro was found to be guilty on counts 1, 7 through 11, 17 and 19. He, together with Covello, was acquitted on count 18. Restaino was found to be guilty on counts 1, and 12 through 16. Inasmuch as the court had submitted the cases of Molinaro and Restaino on counts 7 through 11 and 12 through 16 on the theory that these defendants had aided and abetted the criminal activity of Covello and the jury had acquitted Covello on all of these counts the court set aside these verdicts of guilty. Judgments of conviction against Molinaro on counts 1, 17 and 19 and against Restaino on count 1 have not been appealed. Both received six month prison terms.

The Government's case in support of the allegations in counts 2 through 16 was based on the testimony of four witnesses and the New York Telephone Company records of toll calls from a New York City number, TR 9–3755, to three New Jersey numbers, OR 6–1730, HU 4–4190, and HU 4–9011. The New York number was listed to Howard Garfinkel at 944 Park Avenue, New York City, where Howard and his brother Merrill Garfinkel lived. The New Jersey numbers were listed to one John Marsh and to defendant Molinaro and defendant Restaino respectively. The toll call records the Government submitted in evidence also showed calls to Covello's home number, PL 9–2829, and to the number of the Chez Charles Night Club, HU 3–9405, where Covello was employed as the manager.

Merrill Garfinkel, the key government witness, testified that during the baseball season of 1961 and throughout the football, basketball, and baseball seasons of 1961 up to June 19, 1963, he furnished Covello for an agreed biweekly compensation of $200 a "betting line" by telephoning the "line" to a number in New Jersey. In addition, Merrill testified he would wager with Covello for himself and others over the telephone by using the same number. The calls, he said, were usually placed from a New York City phone booth but were made occasionally from his home at 944 Park Avenue. Merrill did not recall the number which he called in New Jersey during the 1961 baseball season, but he did remember the numbers OR 6–1730, HU 4–4190, and HU 4–9011 as the ones by which he reached Covello during the 1962 –1963 sporting seasons. He had no recollection of the specific contents of any of these calls.

Howard Garfinkel corroborated the testimony of his brother. He testified that he was sometimes present when Merrill called Covello and that he furnished Covello the "betting line" during periods when his brother was on vacation.

A third witness, Vincent Conour, testified that, upon being furnished Covello's number at OR 6–1730 by Merrill Garfinkel, he thereafter telephoned wagers to that number. He also described a visit he made to Covello at 312 Park Avenue, East Orange, New Jersey, the address where OR 6–1730 was located.

A fourth witness, Herbert Seid, testified that he too was introduced to Covello over the telephone by Merrill Garfinkel and that he thereafter placed wagers with Covello by telephone in 1962 and 1963. He could not remember, however, what numbers in New Jersey he had telephoned.

Counts 2 through 6 on which Covello was convicted involve only the OR 6–1730 number. The other two New Jersey numbers relate to counts 7 through 16 on which Covello was acquitted.

Count 17 was based on the testimony of witness Conour concerning an alleged meeting with Covello and Molinaro at Conour's apartment in New York on May 14, 1962 to settle a balance of $5,123 owed to Conour for his winnings.

Count 19 was based on an alleged settlement meeting in New York on June 13, 1963, at which Covello, Molinaro, Merrill and Howard Garfinkel and Herbert Seid were allegedly present.

The sufficiency of the Government's evidence at trial is not in issue. Appellant's appeal, however, alleges a number of evidentiary errors.

## I.

### § 605 of the Federal Communications Act

At the trial the Garfinkels were unable to recall the specific times and dates of their alleged phone calls to the defendant. Instead, the Government submitted in evidence the New York Telephone Company's records of toll calls, or "toll slips," made from the Garfinkels' home number to the aforementioned New Jersey numbers. The slips showed the number from which the call was placed, the number and city to which the call was placed, the fact that the call was completed, the date and time of the call and the length of the conversation. Appellant's objec-

tion to the admissibility of the "toll slips" as evidence obtained in violation of § 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605 (1964), as amended, Omnibus Crime Control and Safe Streets Act of 1968, P. L. 90–351 (June 19, 1968), was denied.

Section 605 then provided:

§ 605. Unauthorized publication or use of communications

No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided,* That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for use of the general public, or relating to ships in distress.[6]

The statute addresses itself to two distinct classes of persons. See Bubis v. United States, 384 F.2d 643, 646 (9 Cir. 1967); United States v. Russo, 250 F.Supp. 55 (E.D.Pa. 1966). In the first category are persons who have to do with the "receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio." The second category encompasses all other persons not within the first class. Arguably, the accounting employees of the New York Telephone Company who furnished the FBI the toll slips in the case at bar, having nothing to do with sending, receiving, or forwarding communications, are not within the ambit of persons proscribed by Clause 1 of § 605, see Hanna v. United States, 393 F.2d 700, 705 (5 Cir. 1968) (rev'd on rehearing, 404 F.2d 405) (5 Cir. 1968); Bubis v. United States, *supra* at 646, and we need go no further unless we find an interception as required by Clause 2. For purposes of this case, however, and this case only, we assume, as appellant apparently wishes us to hold, that treatment of the entire telephone company as one person is the sounder construction of the statute. See Hanna v. United States, 404 F.2d 405 (5 Cir. 1968); United States v. Russo, *supra.*

 Defendant argues that the divulgence of the toll slips was a prohibited

6. The recent amendment to 47 U.S.C. § 605 by the Omnibus Crime Control and Safe Streets Act of 1968 does not alter the substance of the original statute set forth in the text above.

disclosure by the corporate person of the existence of a communication within the meaning of § 605. We disagree. We cannot subscribe to such a literal application of the statutory language where the effect of such an interpretation is to transgress the obvious congressional intent. Section 605 "must be interpreted in the light of reason and common understanding to reach the results intended by the legislature." Rathbun v. United States, 355 U.S. 107, 109, 78 S.Ct. 161, 163, 2 L.Ed.2d 134 (1957).

■■ We agree with defendant that Section 605 was not intended to apply only to the substance of communications, United States v. Dote, 371 F.2d 176, 180 (7 Cir. 1966), affirming United States v. Guglielmo, 245 F.Supp. 534 (N.D.Ill. 1965), and see United States v. Caplan, 255 F.Supp. 805, 808 (E.D.Mich.1966), but we are not here involved with the manipulative use of a pen register,[7] as in *Dote* or *Caplan,* or with some other investigatory device.[8] Rather, the keeping of toll records is a necessary part of the ordinary course of the telephone company's business and is necessary in order that the company may substantiate its charges to its customers. Toll records are kept for all telephone subscribers and are not kept just for subscribers being investigated by officers of the law, or ones suspected of criminal proclivities. The subscriber is fully aware that such records will be made, United States v. Gallo, 123 F.2d 229, 231 (2 Cir. 1941), and the records of the telephone company so kept in the ordinary course of the company's business are entitled to the same evidentiary treatment as the records of other businesses. See Federal Business Records Act, 28 U.S.C. § 1732 (1964). Section 605 was not designed to render evidentially inadmissible the records made in the ordinary course of the telephone company's business and which are essential to the ordinary operation of that business.

Our disposition of this issue obviates the need for us to consider whether the demand of an FBI agent to obtain the records constitutes "other lawful authority" under § 605, or, if a divulgence to a government investigator had been voluntarily made, whether the issuance of a subpena for the records so as to have them produced at a trial cure any original illegal divulgence, or whether a defendant charged with federal crime has standing to challenge the receipt into evidence against him at his trial of tele-

7. The pen register is a mechanical device attached on occasion to a given telephone line, usually at central telephone offices. A pulsation of the dial on a line to which the pen register is attached records on a paper tape dashes equal to the number dialed. The paper tape then becomes a permanent and complete record of outgoing calls as well as the numbers called on the particular line. Immediately after the number is dialed and before the line called has had an opportunity to answer (actually the pen register has no way of determining or recording whether or not the calls are answered) the pen register mechanically and automatically is disconnected. There is neither recording nor monitoring of the conversation. United States v. Guglielmo, 245 F.Supp. 534, 535 (N.D.Ill.1965), aff'd, *sub nom.* United States v. Dote, 371 F.2d 176, 180 (7 Cir. 1966).

In *Caplan* the use of a pen register by the telephone company was stimulated by the Internal Revenue Service in conjunction with an investigation that agency was conducting against defendants for suspected violation of gambling laws. *Caplan* is not a case involving only accounting information kept or commonly known to be kept by the telephone company in the ordinary course of the company's business.

8. A few courts, in fact, have even sustained the admissibility of records obtained by the telephone company through use of pen registers, monitoring, and recording devices, etc., and have upheld subsequent divulgence thereof to a government agency when these devices were employed in connection with any investigations to detect thefts committed against the telephone company. United States v. Hanna, 260 F.Supp. 430 (S.D.Fla.1966), aff'd, 404 F.2d 405 (5 Cir. 1968); Brandon v. United States, 382 F.2d 607 (10 Cir. 1967); United States v. Beckley, 259 F. Supp. 567 (N.D.Ga.1965). Cf. Bubis v. United States, 384 F.2d 643 (9 Cir. 1967). Contra, Huff v. Michigan Bell Tel. Co., 278 F.Supp. 76 (E.D.Mich. 1967).

phone company toll records showing that his number had been called.

## II.

### Best Evidence Rule

Most of the toll records introduced here were copies rather than originals. Appellant contends that the Government did not lay an adequate foundation for the use of such secondary evidence, and that the court below erred in holding to the contrary. The contention is without merit. The admissibility of secondary evidence is within the broad discretion of the trial judge. United States v. Ross, 321 F.2d 61, 70 (2 Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963); Galbreath v. United States, 257 F. 648, 658 (6 Cir. 1918); McCormick, Evidence, 414 (1954); 4 Wigmore, Evidence, 340 (3d ed. 1940). The judge here did not abuse his discretion in ruling that the testimony of a security officer of the telephone company that a diligent search of his office had not uncovered the originals was a sufficient foundation for the introduction of the identified copies.

## III.

### The Jencks Act

Appellant urges that the rights secured to him by the so-called Jencks Act, 18 U.S.C. § 3500 (1964), were violated on several grounds. First, he claims that following the direct testimony of an FBI agent at the pretrial hearing on appellant's motion to suppress evidence obtained through an alleged illegal eavesdrop, discussed *infra*, he was entitled to inspect the agent's reports relating to the agent's testimony, and this inspection was denied him. We approve the ruling below. The Act was enacted by Congress in order to qualify the loose interpretations the lower federal courts[9] had accorded the Supreme Court decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and to provide an exclusive[10] procedure for handling demands by a defendant for the production of statements, reports, and similar material that government witnesses had given to law enforcement agencies prior to the defendant's trial. S.Rep. No. 981, 85th Cong., 1st Sess. (1957), 1957 U.S. Code Cong. & Admin. News, pp. 1861. The specific purposes of the bill were not to make such material available to the defense until "after the Government witness has testified against the defendant on direct examination in open court, and to prevent disclosure before such witness has testified." *Id.* at 1863. Suppression hearings are nowhere alluded to in the legislative history and the statute does not supply any direct guidance for conduct at such hearings.[11]

9. A collection of the lower federal court cases after Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) and prior to the enactment of 18 U.S.C. § 3500 can be found in the legislative history of that Act. H.R.Rep. No. 700, 85th Cong., 1st Sess. (1957); S. Rep. No. 981, 85th Cong., 1st Sess. (1957).

10. "The purpose of the Act, its fair reading and its overwhelming legislative history compel us to hold that statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. § 3500, 18 U.S.C.A. § 3500, cannot be produced at all." Palermo v. United States, 360 U.S. 343, 351, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959). See also Rosenberg v. United States, 360 U.S. 367, 369, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); Canaday v. United States, 354 F.2d 849, 859 (8 Cir. 1966).

11. 18 U.S.C. § 3500 (1964) in its entirety reads as follows:

§ 3500. Demands for production of statements and reports of witnesses

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United

In all probability Congress did not consider the question whether a suppression hearing is itself a "trial" or whether such a hearing is so much an integral part of the criminal trial that determines a defendant's innocence or guilt so as to intend either that the Act apply to such a hearing or that it not do so. In any event, the courts have consistently construed the statute literally, reading "trial" to mean "trial," and have held that under 18 U.S.C. § 3500 the pre-witness-stand statements of persons testifying at suppression hearings are not comprehended within the statements the defense is entitled to examine at suppression hearings. See United States v. Giuliano, 348 F.2d 217 (2 Cir.), cert. denied, 382 U.S. 946, 86 S.Ct. 406, 15 L.Ed.2d 354 (1965); United States v. Wallace, 272 F. Supp. 838 (SDNY 1967); United States v. Cobb, 271 F.Supp. 159, 164 (SDNY 1967); United States v. Leighton, 265 F. Supp. 27, 35 (SDNY), affirmed, 386 F. 2d 822 (2 Cir. 1967), cert. denied, 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed.2d 282 (1968); United States v. Tane, 29 F.R.D. 131, 133 (EDNY 1962); United States v. Abrams, 29 F.R.D. 178, 183 (SDNY 1961); United States v. Rosenberg, 157 F.Supp. 654, 661 (E.D.Pa.), affirmed, 257 F.2d 760 (3 Cir. 1958), affirmed, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). Our decision in United States v. Foley, 283 F.2d 582 (2 Cir. 1960), relied upon by appellant, is not to the contrary. In *Foley* the Government sought by mandamus to have us instruct the district judge to vacate his order providing for a suppression hearing and providing for the production of documents at that hearing. We denied the petition but we read our denial as holding no more than that we left it to the dis-

States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

(e) The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

cretion of the trial judge whether to order a production of documents; we do not read it to hold as a matter of law that the Jencks Act compelled disclosure to defense counsel of the pre-hearing statements of a witness who testifies at a suppression hearing.

▮ Appellant next claims that the good faith destruction of handwritten interview notes deprived him of his rights at trial under the Jencks Act. At the close of the direct examination of each of the Government's main witnesses defendant requested and received FBI reports regarding FBI interviews with each of the witnesses. Defendant claims, however, that under 18 U.S.C. § 3500 he was also entitled to the original handwritten interview notes of the FBI agents from which the reports were made. At a voir dire examination the agents testified that, pursuant to the practice they customarily follow, they destroyed their notes in good faith after incorporating them into typewritten reports. Under the circumstances, we find no violation of § 3500. The case law amply supports our ruling. Absent an indication that the notes were destroyed for an improper purpose or that the handwritten data was not preserved in the formal reports the reports satisfy the requirements of § 3500. United States v. Williams, 384 F.2d 488, 493 (2 Cir.), cert. denied, 385 U.S. 836, 87 S.Ct. 84, 17 L.Ed.2d 71 (1966); United States v. Jones, 360 F.2d 92, 95 (2 Cir.), cert. denied, 385 U.S. 1012, 87 S.Ct. 721, 17 L.Ed.2d 549 (1966); United States v. Comulada, 340 F.2d 449, 451 (2 Cir.), cert. denied, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965); United States v. Aviles, 337 F.2d 552, 559 (2 Cir. 1964); United States v. Greco, 298 F.2d 247, 250 (2 Cir.), cert. denied, 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); United States v. Thomas, 282 F.2d 191,

194 (2 Cir. 1960); United States v. Baker, 358 F.2d 18 (7 Cir.), cert. denied, 385 U.S. 869, 87 S.Ct. 135, 17 L.Ed.2d 96 (1966); Ogden v. United States, 323 F.2d 818 (9 Cir. 1963), cert. denied, 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964).[11a]

Appellant, however, argues that § 3500 does not contain any "good faith exception," citing Lee v. United States, 125 U.S.App.D.C. 126, 368 F.2d 834, 837–838 (1966) and United States v. Lonardo, 350 F.2d 523, 529 (6 Cir. 1965). Both cases are distinguishable. In *Lee* the court's statement that "the Jencks Act does not embody in terms any 'good faith' exception," 368 F.2d at 837, must be read in conjunction with the court's explicit statement distinguishing *Lee* from cases like the one here where the destroyed notes were "incorporated into documents which were produced for the defense." *Id.* at 838, n. 7.[12] And in *Lonardo* the court's holding that the failure to produce interview notes was a violation of § 3500 was carefully restricted to apply when the notes are deliberately destroyed by an FBI agent on the eve of trial and substantial differences between the content of the notes and that of the formal interview report are evident.

▮ Appellant also contends that he was entitled to the federal income tax returns of the Government's main witnesses as "statements" of the witnesses within the meaning of 18 U.S.C. § 3500 (e) (1). While there is no decision on point, the argument is unpersuasive. The filing of the returns of the witnesses was unconnected with the investigation of Covello's activities or the criminal proceedings initiated against him, and the returns were filed with an entirely separate federal agency. Although it is the privilege of defense counsel in run-of-the-mill situations to decide whether examination of requested material would

11a. See also Alexander v. United States, 118 U.S.App.D.C. 406, 336 F.2d 910, cert. denied, 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed.2d 346 (1964); Augenblick v. United States, 180 Ct.Cl. 131, 377 F.2d 586 (1967); Killian v. United States,

368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed. 2d 256 (1961).

12. The deliberate delay by the police between offense and arrest in *Lee* was another factor influencing the Fifth Circuit's decision. 368 F.2d at 837.

advantage the defense, here it seems clear that these income tax returns could not have been in any way helpful. Each witness admitted that he had not reported any income he received from gambling activities, and, as the witnesses had testified they had gambled, these confessions were the most Covello could have hoped to extract from them; the only purpose for which the return could have been used was to impeach the credibility of the makers, see Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L. Ed.2d 1304 (1959). Therefore, we do not rule upon the issue appellant would have us rule upon but state that under the circumstances here it would not appear to have been error to have withheld the returns; but, if error, the error did not prejudice the defense in any way.

▆▆▆▆▆ Covello's final Jencks Act contention is that the court below erred in refusing to direct the Government to turn over to the defense numerous excerpts from FBI reports of statements made by the Garfinkels. After an *in camera* inspection the trial judge ruled that the requested materials bore no relation to the subject matter of the Garfinkels' direct testimony. These withheld materials were sealed for our review of the challenged ruling. The question of whether a statement or transaction falls within § 3500 is ordinarily a question of fact to be determined by the trial court, only reviewable by us within the limits of the clearly erroneous standard. United States v. Sten, 342 F.2d 491, 493–494 (2 Cir.), cert. denied, 382 U.S. 854, 86 S.Ct. 103, 15 L.Ed.2d 91 (1965); United States v. Birnbaum, 337 F.2d 490, 497 (2 Cir. 1964); United States v. Cardillo, 316 F.2d 606, 616 (2 Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963); Hayes v. United States, 329 F.2d 209, 220 (8 Cir.), cert. denied, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964); cf. Campbell v. United States, 373 U.S. 487, 492–493, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Palermo v. United States, 360 U.S. 343, 354, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

We have examined the sealed statements and we hold that the trial court did not commit error. In essence the withheld materials related to the Garfinkels' knowledge of the gambling activities of persons other than the defendants. While the information contained in these materials may have been employed by defense counsel to show that the Garfinkels, whose "betting line" activities they had themselves testified to, were engaged in the business of bookmaking, it is clear that the information the trial judge withheld was not sufficiently relative to the subject matters the witnesses had testified about to fall within limits of demandable material Congress had carefully delineated in 18 U.S.C. § 3500; and if the defense demand had been complied with the judge would have exceeded the statutory proscription embodied within 18 U.S.C. § 3500(b). See note 11, *supra.*

## IV.

### *Validity of the Indictment*

▆▆▆▆▆ The Government's four main witnesses, Merrill and Howard Garfinkel, Seid, and Conour, did not testify before the grand jury that returned the original indictment or the grand jury that returned the superseding indictment. Though these witnesses were available to be called the only evidence presented to either grand jury was hearsay testimony by FBI agents who related statements made to officers by Merrill Garfinkel and Conour. This was discovered by the defense at trial and appellant, attacking the validity of the indictment, moved in arrest of judgment. This motion was denied. We affirm. In Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) the Supreme Court held that an indictment based exclusively on hearsay need not be dismissed. See also Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1958). Though we have recently voiced our disapproval of indictments grounded

totally on hearsay where the witnesses whose information was related to the grand jury by others were available to testify in person, we have never quashed an indictment for this reason. United States v. Umans, 368 F. 2d 725, 730 (2 Cir. 1966), cert. dismissed as improvidently granted, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967); see United States v. Beltram, 388 F.2d 449, 451 (2 Cir.), cert. denied, *sub nom.* Colon v. United States, 391 U.S. 955, 88 S.Ct. 1860, 20 L.Ed.2d 869 (1968); United States v. Andrews, 381 F.2d 377 (2 Cir. 1967), cert. denied, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968); cf. United States v. Payton, 363 F.2d 996, 998–999 (2 Cir.), cert. denied, 385 U.S. 993, 87 S.Ct. 606, 17 L.Ed.2d 453 (1966).

▮ Appellant contends that, irrespective of the state of the authorities, the case before us is distinguishable from *Costello* and the cases following *Costello*. He claims that here the hearsay evidence presented to the grand jury did not sustain all elements of the offense for which appellant was indicted. In particular, he asserts no evidence was given to the grand jury concerning the specific telephone calls on which each of counts 2 through 16 was predicated. We have examined the grand jury minutes and find defendant's charge entirely without substance. The grand jury heard specific testimony relative to each telephone toll call alleged in the Government's bill of particulars, as well as to many other calls also.

### V.

#### *Electronic Eavesdropping*

▮ Appellant next claims that his motion to suppress the fruits of an electronic eavesdropping upon calls to OR 6–1730, the phone number upon which

counts 2 through 6 were predicated, was improperly denied below. This contention is premised on the disposition of the case of United States v. Borgese, 235 F. Supp. 286 (SDNY 1964), conviction vacated, 372 F.2d 950 (2 Cir. 1967), in which the defendant Borgese claimed the Internal Revenue Service had illegally eavesdropped on his telephone calls to OR 6–1730 and in which after more than three years the judgment of conviction was vacated when the United States Attorney ascertained and advised this court that there had been governmental *unlawful wiretapping*. The claim that there was an unlawful *electronic surveillance*, therefore, was left unresolved in the *Borgese* case although such a claim was a main thrust of the arguments upon appeal.

The court below, after holding an evidentiary hearing at which four government agents testified, denied the motion to suppress, and found that no evidence in the case at bar was derived as a result of the eavesdropping in the *Borgese* case. The trial judge found that "the FBI developed this case independently and without knowledge or use of any evidence obtained by the Internal Revenue Service in the Borgese case * * * including the fact that Borgese used or called ORange 6–1730 or any other evidence," and therefore he saw no need to determine the validity of the eavesdropping, if any there were, involving activities and communications of either Borgese or the present appellant, Covello.[13]

As far as we can tell, the Government has never admitted, and the defense has never shown, that there ever had been any electronic "bugging" of the appellant's conversations. Absent a revelation of monitoring activity, Covello's reliance on Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966), va-

---

13. An individual has standing to suppress government evidence obtained through monitoring devices violative of the Fourth Amendment if the conversations overheard were those of the petitioner himself or conversations occurring on his premises, whether or not he was present or participated in these conversations. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (March 10, 1969).

cating and remanding 122 U.S.App.D.C. 347, 353 F.2d 885 (1965), in which certiorari was initially denied, 384 U.S. 927, but granted upon rehearing, 384 U.S. 983, 86 S.Ct. 1884, 16 L.Ed.2d 1002 (1966), and O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), which he offers to support his claim that he is entitled to a new trial is misplaced. In both of these cases the Supreme Court vacated judgments of conviction only after the Solicitor General *voluntarily* advised the Court that conversations in which the defendants participated were overheard and intercepted through use of concealed monitorial devices.

■ Appellant further requests that the Government state whether there has been any electronic eavesdropping or wiretapping upon him by any government agency. He also requests that, if necessary to obtain a compliance, the Government be judicially directed to divulge this information. The trial court ruled that whether action was to be taken upon this request was a matter for the Government, in its discretion, to decide, and not a subject for a court order. While it seemed to us unlikely that a defendant, on whom the burden of proof lies at a suppression hearing, might reasonably be able to uncover the existence of an electronic or wiretap surveillance other than by asking his adversary to tell him of it,[14] for the purposes of this case we have not undertaken the task of evaluating the merits of the ruling below. Instead, we have endeavored to elicit, from the Department of Justice, a response to appellant's question. The Department courteously cooperated and the essential parts of our correspondence are set forth below.

■ On February 15, 1968 on behalf of the panel I wrote the following letter to Robert M. Morgenthau, United States Attorney for the Southern District of New York:

"The panel of Judges Waterman, Feinberg and Bartels have discussed the above case, and, in view of the proceedings in U. S. v. Schipani and U. S. v. Borgese with which you are so familiar, and in view of statements recently made by the Attorney General of the United States, we three judges, through me as the panel scrivener, desire to know whether the United States has conducted a Schipani-type review to ascertain whether there may have been monitoring that might have affected the trial.

"We think we should be informed of whether such a review has been conducted, is now in progress or is contemplated before we consider further the issues presented to us for resolution."

The subsequent correspondence of the parties with us we have treated as supplemental briefs *post-argument*.

On February 27, 1968 Mr. Morgenthau replied as follows:

"The Department of Justice, as it indicated to the Supreme Court in the case of Schipani v. United States, has undertaken an extensive review to identify any instances of unlawful electronic surveillance affecting a case which has been brought to trial.

"Such a review has been conducted with respect to the above-captioned case of Joseph Covello. The Department of Justice has no information indicating that conversations of Joseph Covello were at any time overheard by unlawful electronic surveillance."

14. In Title III, § 802, of the Omnibus Crime Control and Safe Streets Act of June 19, 1968, Pub.L. 90-351, 18 U.S. C.A. §§ 2510-2520, there are now provisions that would seem to assure that a defendant would know before his trial whether his conversations had been intercepted by government agents and in most cases what the intercepted conversations contained. In the usual case he would at the very latest be armed ten days before trial with this knowledge and would have an opportunity to suppress the evidence before trial. 18 U.S.C. § 2518(8) (d), (9), (10).

Thereafter, defense counsel, interpreting the above reply, suggested that the review undertaken by the Department of Justice was insufficient and that an adversary hearing in the district court to determine whether there had been electronic surveillance was still necessary. He advanced four grounds in support of his position, none of which appear to us to have merit for we fail to perceive how an additional hearing would further illumine the problem.

Appellant first objects to the United States Attorney's February 27 letter on the ground that the question of the "lawfulness" of any electronic eavesdropping is not properly a matter for ex parte determination by the Justice Department. This objection is adequately disposed of by a subsequent communication from the United States Attorney's office. In this later correspondence, in reply to a letter of defense counsel inquiring whether the Schipani-type review the Department had conducted included an examination of the recordings and records of the monitoring that was done in the case of United States v. DeCavalcante, Criminal No. 111–68 (D.N.J. April 16, 1968), the Government flatly and unequivocally stated that "Mr. Joseph Covello * * * had not been a subject of direct microphone surveillance nor were any of his conversations monitored by any electronic device." [15] In *DeCavalcante* the prosecution conceded that premises which the defense now asserts Covello frequented on numerous occasions had been under microphone surveillance. The recent Supreme Court pronouncement in

Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (March 10, 1969) denying a defendant standing to suppress evidence derived from the electronic surveillance of other persons, including the defendant's codefendants and co-conspirators, eliminates a second claim that Covello is entitled to have the Government disclose that very information. See note 13, *supra*.

As for the last two grounds urged to demonstrate that the Schipani-type review has been insufficient, we agree with appellant that, despite all the correspondence that has transpired in this case while it has been *sub judice*, there remains the possibility that a federal agency other than the FBI, such as the IRS, or state or local authorities, may have engaged in eavesdropping activities affecting Covello's privacy, and that such possibilities have not been fully foreclosed. But we feel assured that if any monitoring of defendant has taken place by any agency other than the U. S. Department of Justice, the monitoring *was not known* to the prosecution when Covello stood trial and that no information was obtained from any electronic surveillance of anyone's activities that was of value to the Government in connection with the case against Covello to taint the evidence the Government introduced at his trial.

 Covello additionally submits that he should be granted another adversary hearing on his motion to suppress in order to cross-examine the FBI agents who monitored the electronic surveillance involved in the *DeCavalcante*

---

15. This statement was contained in a letter of July 17, 1968 from the Chief of the Department of Justice, Organized Crime and Racketeering Section, to U. S. Attorney Morgenthau and delivered by him to the panel with his enclosing letter of July 31, 1968. A fuller excerpt from the letter follows:

"We have previously advised you that we had made inquiry as to Mr. Joseph Covello and that a review of the records revealed that he had not been a subject of direct microphone surveillance nor were any of his conversations monitored

by any electronic device. Based upon the information contained in the enclosed letter of Williams & Connolly we inquired further of the Federal Bureau of Investigation referring them specifically to the installations referred to in the enclosed letter. We have just been notified that these locations had been taken into consideration in the previous review in this matter and Covello could not be identified as being present at or a participant in any conversations monitored by electronic devices at these locations."

case, discussed *supra,* and thereby to verify the assertions made by the FBI to the United States Attorney's office. See note 15 *supra.* Furthermore, for purposes of such hearing, relying upon Baker v. United States, 131 U.S.App.D.C. 7, 401 F.2d 958 (1968), appellant contends "that the logs kept by the agents who conducted the monitoring (and the recordings made if they are still in existence), insofar as these contain voices not identified by the agents, should be produced for inspection by appellant and his counsel to see if they can identify the conversation as one in which the appellant participated or which relates to the subject matter of the indictment." [16]

Appellant argues that inasmuch as the prosecution in the *DeCavalcante* case has admitted the installation of microphonic devices at two specific New Jersey locations his case should be remanded to the district court for a hearing on the eavesdropping issue. He points out that he lives in New Jersey and that on numerous occasions during the time of the electronic surveillance directed at DeCavalcante he was present at the "bugged" premises. The Government assures us that the Schipani-type review conducted at our request included a review of the eavesdropping directed against DeCavalcante, and we refuse to subscribe to the need for a hearing; otherwise we would enable any defendant each time an eavesdropping of a location is disclosed subsequent to his trial to assert he was present at that location sometime during the "bugging" and thereby be entitled to a suppression hearing.

Nor are we persuaded that the holding in Baker v. United States, *supra,* aids the appellant in his quest for a hearing. Prior to the hearing in *Baker* the Government had made available to the defense all logs of conversations in which appellant Baker had been identified by the monitors as a participant or as having been present but did not make available any logs of conversations involving only unidentified persons. The Court of Appeals for the D. C. Circuit reversed this aspect of the district court ruling which had been in favor of the Government and remanded for another adversary hearing before which appellant Baker could inspect the logs of conversations of these unidentified persons. The court stated:

> Inasmuch as the Government admitted both that it had overheard appellant's conversations through the Levinson and Sigelbaum devices and that it had intercepted other conversations involving unidentified persons, and in view of appellant's testimony that he had engaged in numerous conversations that might have been overheard through those devices, the possibility of appellant's having standing as to one or more of the undisclosed conversations was neither remote nor insubstantial. Certainly appellant was the person best qualified to ascertain whether any of the unidentified conversations was his, and the court's *in camera* examination of the logs, however diligent and careful, was hardly an adequate substitute, in these circumstances, for an adversary proceeding. 401 F.2d at 984.

Our case is quite dissimilar. Baker's voice was concededly identifiable when the recordings were played back, and so the Court of Appeals held that the defense was entitled to hear all recordings of all voices made at the premises. Here no recording of Covello's voice was used or to be used against him. Covello seeks to detect whether a mystery voice recorded by devices employed to record the conversations of others than he could have been his voice. We find this broad difference in the two situations to be of controlling significance.

---

16. From September 19, 1968 letter of Attorneys Williams & Connolly to the panel in response to the letter of the United States Attorney of July 31, 1968. See note 15, *supra.*

Nor does the recent Supreme Court ruling in Alderman v. United States *supra*, extending the right of defendants to see transcripts of illegally monitored conversations have any bearing upon a judicial determination relative to whether one may also have the right to a suppression hearing. The rules set forth in *Alderman* do not become operative unless there is an admission by the Government that a pertinent electronic eavesdropping had occurred.

Finally, appellant contends that his character was improperly placed in issue and that the Government did not confine its proof to the bill of particulars. We find these contentions unpersuasive.

Accordingly the judgment of conviction is affirmed.