## Commonwealth v. Borghmann

*Arthur R. Makadon,* Assistant District Attorney, for Commonwealth.

*Bernard L. Segal* and *David Rudovsky,* for defendants.

SPAETH, J., May 13, 1971.—

*Nature and History of the Case*

Defendants have moved to quash indictments charging them with unlawful possession of explosives and conspiracy.

On April 12, 1971, defendants filed an application for disclosure and production of evidence obtained by wiretapping and electronic surveillance. Testimony on the application was concluded, after some interruptions, on April 27th. Thereupon, contending that the testimony showed that disclosure had been refused, defendants moved to quash the indictments. Argument was heard, and briefs have been received.[1]

## STATEMENT OF THE CASE

On April 8, 1969, the Philadelphia police obtained a warrant to search defendants' apartment at 4946 Cedar Avenue, Philadelphia.[2] The police executed

---

[1] Various other motions have been filed by defendants but it is unnecessary to describe these, except that it should perhaps be noted that defendants have filed a motion that the Commonwealth be required to disclose the identity of an informant, counsel agreeing, however, to defer argument on this motion pending the outcome of the present proceeding.

[2] Exhibit "P-1" is a copy of the transcript of the hearing on defendants' motion to suppress the items seized pursuant to the execution of the warrant.

the warrant on April 9th, and in the course of searching the apartment they found and seized gunpowder, three lengths of pipe, a plastic explosive and fuse material. They arrested defendant Fraser, who was present during the search, and defendant Borghmann, who arrived shortly afterwards, and two others. On April 18th, defendants, after a preliminary hearing, were held for the grand jury.

When defendants' application for disclosure was called for hearing on April 15, 1971, defendants' counsel stated that they wished to call as their first witness Lt. George T. Fencl of the Philadelphia Police Department. Lieutenant Fencl was the officer who had obtained the warrant to search the apartment where defendants were arrested, and had been in command of the search. The assistant district attorney objected on the ground that in response to defendants' application he had filed an affidavit that "[no] Commonwealth agency employed any wire-taps or electronic surveillance in this case." After receiving an offer of proof from defendants' counsel, and after hearing argument, the court sustained the objection, ruling that defendants' counsel proposed to proceed in too oblique a manner, and that if they believed that the Federal Bureau of Investigation had engaged in wiretapping or electronic surveillance, they should call the appropriate Federal agent.

When the hearing resumed on April 21st, defendants' counsel proposed to call as their first witness Jeremiah W. Doyle, Special Agent of the Federal Bureau of Investigation, who was present in response to a subpoena. Thereupon, Robert N. de Luca, Esq., Assistant United States Attorney, objected on two grounds. First, he moved that the subpoena be quashed, on the ground that defendants' counsel were on a "fishing expedition"; and second, he moved that if the subpoena

were not quashed, the agent should not be required to testify until he had had an opportunity to obtain instructions from the Attorney General, Mr. de Luca submitting to the court a copy of regulations issued by Attorney General Ramsey Clark on June 29, 1967, but still in effect, instructing Federal agents that, if subpoenaed, they should decline to respond until they had received instructions from the Attorney General with respect to the testimony they could give. The court ruled that defendants' counsel must, if they could, offer testimony of persons other than the agent sufficient to show that they were not on a fishing expedition. In response to this ruling, counsel called defendant Fraser, defendant Borghmann and Miss Jane Debra Friedman, who had been arrested with defendants but was discharged at the preliminary hearing. Counsel also offered, and the court received, a copy of the transcript of the hearing on defendants' motion to suppress the items found and seized in the apartment.[3] The narrative that follows is a summary of so much of this evidence as the Court considers pertinent.

Shortly after being arrested, on April 8, 1969, defendant Fraser conceived the idea of soliciting the help of the Black Panther Party in California.[4] In pursuit

[3] Counsel also attempted to authenticate by Special Agent Doyle's testimony a certain document as a copy of a document from one of the Federal Bureau of Investigation's files. Without requiring the agent to testify, the court assumed the authenticity of the document and instructed counsel to proceed with their other witnesses, the court reserving its ruling as to the relevance of the document. In the event, the document was never offered in evidence.

[4] When asked on cross-examination how he happened to conceive this idea, defendant replied:

"Well, we had been framed here in Philadelphia for the charges that we are discussing now and the Black Panther Party in our

of this idea, between April 16th and 20th or 21st, he made several three-way telephone calls from his apartment to "my colleagues in New York [City] and the West Coast headquarters of the Black Panther Party . . ." His colleagues were Steve Komm and Tony Papert. The purpose of the calls was "to establish a meeting with the national leadership of the Black Panther Party, particularly Bobby Seale and Dave Hilliard, to discuss the joint defense of the Black Panther Party and the then Philadelphia SDS Labor Committee." Defendant was a member of the Philadelphia SDS Labor Committee, as was defendant Borghmann, and Komm and Papert were members of the New York SDS Labor Committee. The only persons with whom defendant discussed his plan to meet with Seale and Hilliard, apart from Komm and Papert, were defendant Borghmann and Miss Friedman.

On April 23rd, defendant Fraser went to New York City, from which he flew to San Francisco, where he was met by members of the Black Panther Party, who took him to Berkeley, where he met Seale and Hilliard, either on April 24th about midnight or in the early hours of April 25th, after which he flew back to New York City, returning to Philadelphia on April 26th.[5]

---

opinion has been similarly framed and we felt that we had a common interest in joining together with them to defend ourselves and other people in the country faced with a similar problem.

"Q Who gave you the specific idea . . .?

"A. Oh, it was my idea . . . ."

[5] Papert flew from New York City to California with defendant Fraser. The record is not clear whether Papert and defendant Fraser made the entire trip together. Also, a George Turner "went on the trip . . . [and] knew about the plan to go to California." The record does not reveal who Turner is; defendant Fraser testified that he was still in contact with Komm, Papert, and Turner, that "[s]ome of them" were in the court room, and that so far as he knew none was an informer for the Federal Bureau of Investigation.

With respect to defendant Fraser's activities, it also appears from the record that he may have come to the attention of the police as early as February 1969, when the Philadelphia SDS Labor Committee "initiated a large sit-in at the University of Pennsylvania." The sit-in lasted six days, and was reported by newspapers, TV and radio. Representatives of the news media interviewed defendant, and during the first three days of the sit-in, he was one of those who, as representatives of the students who were sitting in, engaged in negotiations with representatives of the university administration.

Defendant Borghmann and Miss Friedman corroborated defendant Fraser's testimony. Defendant Borghmann testified that he never discussed the plan to go to California with anyone except defendant Fraser. He said he believed the discussion was in the apartment where he and defendant Fraser lived, the weekend before the preliminary hearing. He said that he did not go on the trip because of the expense, adding, "I felt that Steve [defendant Fraser] could represent my point of view in San Francisco." He said the money for the trip came from the New York SDS Labor Committee and that "we were concerned about this particular trip because of the nature of the Government attack on the Panthers, that type of thing, the nature of the negotiations, to keep it as much as possible secret."

Miss Friedman testified that she learned of the plan to go to California before the preliminary hearing, from defendant Fraser, she thought in a telephone call, and that she may have discussed it with defendant Fraser one other time in person, but with no one else. She said that defendant Fraser told her not to talk about the plan, and that she made "a distinct effort" not to.

Defendant Borghmann and Miss Friedman also

testified that on April 25th, the day that defendant Fraser flew back from California to New York, an incident occurred that they described as follows:

Sometime during the afternoon of April 25th, the Philadelphia SDS Labor Committee was conducting a rally in front of City Hall to protest the arrest of defendants. Defendant Borghmann and Miss Friedman were setting up sound equipment when Lieutenant Fencl came up to them, according to defendant Borghmann, "took out his black book in which he keeps notes and said that he hoped that Steve Fraser had a good trip out to San Francisco and that he didn't get air sick."[6]

One Larry Elle, evidently also a member of the labor committee, replied that "the only thing that made Steve sick was Lt. Fencl," and after an exchange between Elle and the lieutenant, the incident ended.

The balance of defendants' evidence was the transcript of the hearing that had been held on their motion to suppress as evidence the items seized in their apartment. An examination of this transcript reveals the following.

In the affidavit in support of the issuance of the warrant, it is recited, in part, that:

"Information received from a reliable source, who in the past has furnished information leading to the arrest and conviction of seven persons wanted by the Police, does so state that there are explosives and explosive devices stored at the above location [defendants' apartment] and that he personally has observed them there. These are to be used to cause extensive damage to life and property at places selected by them in the near future."

"On 4/8/69 information received from the Federal

_____

[6] Miss Friedman's version, substantially the same, is at N.T. 97.

Bureau of Investigation from their confidential source, that the members of the Students for Democratic Society are planning the bombing of historical sites in both Philadelphia and Boston, as these are the seats of Democracy and had to do with the founding of the United States and should be blown up according to their information."

At the hearing on the motion to suppress, Lieutenant Fencl testified as follows:

The first information that he had received "was maybe around the 15th or 16th of March." "Maybe a day or two" before March 26th, his informant told him that he had seen explosives in the apartment. Starting on March 26th, and until the search, on April 9th, the police had the apartment under surveillance. On the evening of April 7th, Lieutenant Fencl received a telephone call to the effect that "The FBI was keeping in daily touch with the SDS, and had a tip it had plans to destroy by explosion places in Philadelphia and Boston . . ." On the morning of April 8th, he "received a copy of a bulletin." Evidently this was an FBI teletype and referred to a meeting on March 30th in Boston touching the use of explosives by SDS . . . "for the bombing of Historical buildings. It said that Historic sights [sic] in Boston and Philadelphia should be blown up. They included Harvard University, at Cambridge, Massachusetts, University Hall at Boston University, Old South Meeting, the Old State House, Boston, and the Nathan Hale Statue."

Defendants were not named as having attended this meeting.

It also appears that Lieutenant Fencl may have had other contacts with the Federal Bureau of Investigation. During the hearing on the motion to suppress, he was asked on cross-examination about "inflammatory matter . . . being distributed by SDS Labor Committee," after which the following ensued:

"Q. Isn't that a fact what that refers to turned out to be an explosion caused by an ex-Marine who turned out to be a psycho as a result of World War II activities?

"A. I did not get the outcome.

"Q. Did you say the bombings were caused by SDS?

"A. I did not say that.

"Q. What did you say?

"A. I said pipe explosives were the type used.

"Q. Where did you get that information?

"A. From public papers, and I talked to an FBI agent who said the same thing."

It is not apparent from the record, however, when this conversation occurred.[7]

---

[7] There is other evidence that at least the Civil Disobedience Squad, of which Lieutenant Fencl is the head, had a further contact with the Federal Bureau of Investigation. Defendant Fraser, while being questioned on cross-examination regarding whether he attempted to avoid being followed to California, testified that he did not make such an attempt but that he had later heard that someone had followed him. On redirect examination, he testified that he had heard

"A. . . . that the FBI requested of the local Civil Disobedience Squad—

"Q. Philadelphia Police Department?

"A. Of the Philadelphia Police Department that since they, the FBI, didn't have a black agent available would the Civil Disobedience Squad provide one to trail me to the West Coast.

"Q. And to your information did it indicate whether the Civil Disobedience Squad of the Philadelphia Police Department honored the request of the FBI for a black Philadelphia Policeman?

"A. Yes, my information is they honored the request.

"Q. Does your information indicate whether or not that Philadelphia Policeman did in fact follow you to San Francisco?

"A. Yes."

On recross-examination, the assistant district attorney asked defendant the source of his information that he had been followed. Defendant's counsel's objection was sustained and defendant was not required to answer, the court considering that since the Commonwealth was resisting disclosure of its confidential informant, it was only fair, temporarily at least, to allow defendant's informant to remain undisclosed.

At the conclusion of defendants' evidence, and after argument, the court ruled that defendants' counsel had shown enough to make it appropriate to permit them to call as their next witness, Special Agent Doyle. Accordingly, the court denied the Assistant United States Attorney's motion to quash the subpoena pursuant to which the agent had appeared. The court, however, granted the Assistant United States Attorney's motion that the agent be given an opportunity to obtain instructions from the Attorney General with respect to his testimony.

When the hearing resumed, on April 23rd, the Assistant United States Attorney presented to the court a telegram from the Attorney General of the United States, which read, in part, as follows:

"The Director of the Federal Bureau of Investigation has advised me that none of the information furnished by the Bureau in connection with the pending case resulted from any type of electronic surveillance or overhearings of the aforesaid defendants or of their attorneys.

"The Court has ordered that you reappear tomorrow morning in response to the aforesaid subpoena. You or your authorized representative should, of course, appear as required and you may testify to the facts set forth in the preceding paragraph. Beyond, that, however, you are hereby instructed to respectfully decline to produce any material contained in the files of the Department of Justice or give testimony as to any information received in the course of your official duties."

Argument by counsel ensued. The argument revolved about the meaning of the statement by the Attorney General that none of the information given the Philadelphia police "resulted from any type of electronic surveillance or overhearings of . . . defendants . . . or of their attorneys." As a result, the court ruled as follows:

"My first ruling is that I assume that the agent would follow those instructions and will not at this time require that he actually take the witness stand and testify as the Attorney General has instructed him to.

"My second ruling is that on that assumption I have concluded that the Attorney General's instructions to the agent are not sufficiently clear for me to make a decision on the legal issues presented by respective counsel's argument.

"My third ruling is that in order that I may be put into a position where I may make a ruling I am going to submit to Mr. de Luca three questions with the instruction that he obtain from the Attorney General an answer whether the Attorney General will clarify the telegram that I have just read by answering any one or more or all of those three questions and with the further instruction that the agent shall reappear in Court at 10 o'clock Monday morning armed with those instructions and prepared to testify in accordance with those instructions.[8]

"I specifically note that in making those rulings that I just enunciated I have not decided what my ultimate ruling must be. In particular I mean by that that if the Attorney General, for example, responds that he will not authorize the agent to answer any of the additional questions, then, I shall hear argument on Monday as to whether I should be satisfied with that response or whether I should consider that it is inadequate and take some further action such as counsel for the defense have indicated they will request me to take, namely, to quash the indictment. If the Attorney

---

[8] [The first question was submitted by the Assistant District Attorney and the second and third by defendants' counsel, the questions reflecting opposing theories of the case.]

General concludes that he will answer one of the questions, then, I will hear exactly the same argument and so I will if he concludes to answer two or all three of the questions.

"The questions that I put are as follows:

"Number One. The Assistant District Attorney has informed the Court that the only information that he has received from the Federal Bureau of Investigation is the following:

"On April 8, 1969, information was received by the Philadelphia Police Department from the FBI that a confidential FBI source had told the Bureau that members of SDS were planning the bombing of historical sites in Philadelphia and Boston.

"Question: In obtaining this information did the FBI either directly or indirectly employ any wiretap or electronic surveillance? For example, assuming an informant gave the FBI the information was the informant acting or responding to instructions given to him by the FBI based on information received through wiretap or electronic surveillance?

"Question Number Two: Did any Federal agency, Federal agent or Federal employee conduct any wiretapping, bugging, electronic surveillance or other similar surveillance of any wire or oral communications to which Steven C. Fraser or Richard Borghmann were either a party or physically present while the surveillance was conducted, from January 1, 1969, through the date of the preliminary hearing in the case pending before the Court, namely April 18, 1969?

"The third question is this: Did any Federal agency, Federal agent or Federal employee conduct any wiretapping, bugging, electronic surveillance or other similar surveillance of any wire or oral communications to which Steven C. Fraser or Richard Borghmann and their attorneys, Bernard L. Segal and David Rudovsky

were either a party or were physically present while the surveillance was conducted, from January 1, 1969, through April 22, 1971?

"My final ruling is that I note that counsel for the defense have submitted another question in which they ask to be advised with respect to surveillance of any wire or oral communications to which their clients were either a party or physically present while the surveillance was conducted from January 1, 1969, through the date of the indictments in this case, namely, September 20, 1970, and I have concluded that as a matter of law there has not been made such a record as would warrant so broad a question.

"Gentlemen, first of all, and I direct this particularly to you, Mr. de Luca, do you have any question about my instructions to you?

"MR. de LUCA: Your Honor, it is my understanding that the Court is submitting to me for transmittal to the Attorney General three questions. It is my understanding that the Court expects one of four possible answers, the first being that the Attorney General will answer all three questions submitted by the Court; and the second, that the Attorney General will answer any two of the three questions submitted by the Court; the third being that the Attorney General will answer only one of the three questions submitted by the Court and the fourth being that the Attorney General will elect to stand on the original answer transmitted to Philadelphia by telegram and already a part of this record.

"THE COURT: That is correct.

"MR. de LUCA: Further than that, Your Honor, I have no questions."

On April 27th, the court was advised by counsel that the agent had received further instructions from the

Attorney General, whereupon the hearing resumed, and the agent testified as follows:

"Q. Will you please now state to the Court, Agent Doyle, what your instructions are from the Attorney General?

"A. I have been authorized by the Attorney General of the United States to advise the Court that in obtaining the information which the Federal Bureau of Investigation furnished the Philadelphia Police Department on April 8, 1969, in connection with this case, the Federal Bureau of Investigation did not, either directly or indirectly, employ any wire tap or other electronic surveillance. . . .

"Q. My question is I gather you are not authorized to give any further information than the reply you have just given us?

"A. That is correct."

The agent was then excused, and no further evidence was offered, either by defendants or the Commonwealth.

### FINDING OF FACT

On the basis of the evidence that has been summarized in the foregoing statement of the case, it is a reasonable inference that between January 1, 1969, and April 18, 1969, the Federal Bureau of Investigation, either by wiretapping or electronic surveillance, intercepted conversations to which one of defendants was a party.

### DISCUSSION OF THE FINDING OF FACT

As a rule, at least so far as appears from the cases that counsel have cited or that the court has found, the government states whether or not there has been any wiretapping or electronic surveillance. In the present case, however, the government has declined

to make such a statement. It might be argued that, despite this fact, the court should have found that there was no wiretapping or electronic surveillance; and the argument might go somewhat as follows.

The assistant district attorney has advised the court that no one on behalf of the Commonwealth has done any wiretapping or electronic surveillance. It is apparent from the record of the hearing on defendants' motion to suppress that Lieutenant Fencl entered and searched defendants' apartment on the authority of a warrant that depended on two categories of evidence: (1) Evidence learned from an informer, who told the lieutenant that he had seen explosives in the apartment, and from police officers who kept the apartment under surveillance; and (2) a tip from the Federal Bureau of Investigation regarding an SDS meeting in Boston. With respect to the first of these categories, there is no suggestion of wiretapping or electronic surveillance; and with respect to the second, the Attorney General has replied that "the Federal Bureau of Investigation did not, directly or indirectly, employ any wire tap or other electronic surveillance."

These facts, however, would not support a finding that no wiretapping or electronic surveillance occurred. Perhaps they might, if there were no other evidence; but there is other evidence.

The most striking part of this other evidence is the evidence that Lieutenant Fencl knew of defendant Fraser's flight to San Francisco. Since the plans for the flight were made over defendants' telephone, it is evident that the lieutenant may have learned of the flight from an agent of the Federal Bureau of Investigation who had wiretapped the telephone, or had placed defendants' apartment under electronic surveillance. It is further evident that such an agent probably would have intercepted more than one conversation, since wiretapping and electronic surveillance are by

nature continuing techniques, the person conducting them often not knowing when a conversation will occur.

Corroborating these inferences is the evidence that the Federal Bureau of Investigation asked the Philadelphia police to provide a black officer to follow defendant Fraser during the flight, indicating that the bureau knew of the flight some time before it occurred. Also corroborative is Lieutenant Fencl's testimony, on defendants' motion to suppress, that the Philadelphia police had had defendants under surveillance at least since mid-March 1969, and that in conducting this surveillance they had cooperated with the Federal Bureau of Investigation, which on April 7th had passed on to the police a tip regarding an SDS meeting in Boston. Also corroborative is the evidence that defendant Fraser had, at least in all probability, come to the attention of the Philadelphia police and the Federal Bureau of Investigation as early as February 1969, when he had been active in the sit-in at the University of Pennsylvania.

It may be granted, as the assistant district attorney has argued, that the record does not prove, in the sense of proof by demonstration as compared to proof by inference, that any of defendant Fraser's telephone calls to New York City was intercepted by wiretapping or electronic surveillance. Perhaps, for example, Lieutenant Fencl only learned of defendant Fraser's flight because a police agent assigned to follow defendant followed him to the airport. Such an argument, however, is unsupported by any evidence. No police agent was called to testify; nor was Lieutenant Fencl called to explain how he had learned of the flight; indeed, no one was called to contradict either defendants' evidence or the inferences reasonably deducible from defendants' evidence.

Even more significant than this lack of contradic-

tory evidence is the limited nature of the Attorney General's responses to the questions put to him. It seems fair to conclude from these responses that the information about the Boston meeting, which the Federal Bureau of Investigation passed on to the Philadelphia police, was given to the Bureau by an informer who had been at the meeting, or had talked to some one who was, and was not obtained by wiretapping or electronic surveillance. However, that is the most that can be gathered from the responses. The Attorney General has not said that in some other aspect of the surveillance, either of the SDS generally or of defendants particularly, none of defendants' telephone conversations was intercepted by wiretapping or electronic surveillance. Indeed, he was specifically asked whether there had been any interceptions of defendants' conversations "from January 1, 1969, through the date of the preliminary hearing in the case pending before the Court, namely, April 18, 1969," [9] and he declined to permit Special Agent Doyle to answer. If there were no such interceptions, why has the Attorney General not simply said that there were not? [10]

On such a record the court is left with no alternative but to find that it is a reasonable inference that during the period about which the Attorney General was

---

[9] One copy of the transcript reads "April 8," but this is an evident error; another copy of the transcript, prepared immediately after the question was dictated so that the Assistant United States Attorney could transmit it to the Attorney General, correctly reads "April 18."

[10] As, for example, in United States v. Covello, 410 F.2d 536 (2d Cir.), *cert. denied*, 396 U. S. 879 (1969), rehearing denied, 397 U. S. 929 (1970), where, on inquiry from the Court of Appeals, the Department of Justice said that no conversation of defendant had been intercepted.

asked there were interceptions of conversations to which one of defendants was a party.

## DISCUSSION OF THE LAW

In two respects, the present case appears to be novel: First, as indicated in the discussion of the finding of fact, in no other case that counsel have cited or that the court has found has the Attorney General given so limited an answer as in the present case. Rather, in other cases he has stated, either that there was an interception by wiretapping or electronic surveillance of a conversation to which a defendant was a party, or that there was not. Second, in no other case cited or found does it appear that the relief requested would impinge upon a State, rather than upon a Federal, prosecution. As some rather considerable discussion will be necessary to resolve the issues presented by these circumstances, some preliminary remarks may be helpful.

Although eavesdropping is an ancient practice, it did not become widespread, and so did not matter much, until the development of the electronics industry, which has invented and produced in large numbers devices enabling the interception without detection even of whispers in a locked room. For some time the courts have struggled with the implications of this development, the question, stated in the most general terms, being whether it was for the courts or the legislature to undertake to inhibit so manifest a threat to the citizen's freedom. Finally, in a series of decisions culminating in Katz v. United States, 389 U.S. 347 (1967), it was recognized that an electronic interception is a kin of the search under a general warrant, and so must be held within the prohibitions against unreasonable searches imposed by the Fourth Amendment, if the guarantees of the First Amendment to

freedom of speech and of the Fifth Amendment to the right not to incriminate oneself are to have any substance.

This decision made, however, difficult problems remained. For an electronic interception, however analogous to a search under a general warrant, is different in one important respect: it can be conducted in secret; the person whose conversation is intercepted will never know of the interception, unless the government chooses to tell him. The problems created by this fact came to a head in Alderman v. United States, 394 U. S. 165 (1969). There, after defendants had been convicted, it was learned that the conversations of at least some of them had been intercepted. The government, however, had not used the interceptions as evidence and so defendants did not know what they had said that the government knew. Furthermore, the government declined to disclose what it knew. The court resolved this deadlock by putting the government to a choice: either it disclosed to defendants the contents of the interceptions, by playing the tapes, or it would suffer a dismissal of the prosecution.

The present case goes one step beyond Alderman v. United States, supra: not only has the Attorney General declined to reveal what was intercepted; he has declined to reveal even whether there was an interception. It will be necessary, therefore, to consider, against the background of the developments leading to Katz v. United States, supra, and Alderman v. United States, supra, the consequence of the Attorney General's action, not as concerns the Federal government, which is not prosecuting defendants, but as concerns the Commonwealth.

1. *When are wiretapping and electronic surveillance in violation of the Fourth Amendment?*

The Fourth Amendment of the United States Constitution provides that

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[11]

It is apparent that whether these provisions apply to interceptions of conversations, either by wiretapping or electronic surveillance, will depend upon whether interceptions are regarded as "searches," and conversations as "things to be seized."

For a time, interceptions were not regarded as searches. See Olmstead v. United States, 277 U. S. 438 (1928) (interception of telephone conversation upheld where no unlawful entry into the house); Goldman v. United States, 316 U. S. 129 (1942), (use of detectaphone placed against office wall in order to hear conversations in office next door upheld where no physical trespass); On Lee v. United States, 343 U. S. 747 (1952), (recording of conversation with Federal agent upheld); Silverman v. United States, 365 U. S. 505 (1961), (holding illegal "eavesdropping . . . accomplished by means of an unauthorized penetration into the premises"): Id. at page 509.

---

[11] See Berger v. New York, 388 U. S. 41, 45-8 (1967), for a summary history of wiretapping, (where the interception is by a connection with a telephone line) and of electronic surveillance (where one of a wide variety of sophisticated electronic devices, often referred to as "bugs," is used, as, for example, by being concealed in an unsuspected place, as in a lamp, or tie clasp, or cuff link, from which it transmits conversations on a special frequency to an outside receiver). In concluding this history, the court said:

"Since 1940 eavesdropping has become a big business. Manufacturing concerns offer complete detection systems which automatically record voices under most any condition by remote control": Id. at page 47.

In Wong Sun v. United States, 371 U. S. 471 (1963), however, it was held that a conversation was something that could be seized, the court finding that "the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects' ": Id. at page 485.

With this decision, the requirement of an "entry," "trespass," or "penetration" before there could be a "search" soon fell.

In Lopez v. United States, 373 U. S. 427 (1963), the court still seemed to regard as significant whether "the electronic device [had been] planted by an unlawful physical invasion of a constitutionally protected area": Id. at pages 438-39. It was apparent, however, that interception of a conversation by the use of a spike inserted until it touched a heating duct, as in Silverman v. United States, supra, differed from interception by the use of a more sophisticated device only in terms of technique; and if one technique involved an unlawful invasion of a constitutionally protected interest, so should another. Thus, in Katz v. United States, 389 U. S. 347 (1967), the court said:

"[T]his effort to decide whether or not a given 'area', viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. [Footnote omitted.] For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citing cases.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citing cases] : Id at pages 351-52.

On this reasoning, the court held that an interception of defendant's end of a telephone conversation, by

an electronic listening and recording device attached to the outside of a public telephone booth, was within the Fourth Amendment.

It is evident from the court's various decisions that it was compelled to this position by a recognition of the impact of wiretapping and electronic surveillance on the citizen's freedom. For example, in Osborn v. United States, 385 U. S. 323, 329, n. 7 (1966), the court cited with approval the following observation by the Chief Justice, concurring in Lopez v. United States, supra, at page 441:

"I also share the opinion of Mr. Justice Brennan that the fantastic advances in the field of electronic communication constitute a great danger to the privacy of the individual; that indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments; and that these considerations impose a heavier responsibility on this Court in its supervision of the fairness of procedures in the federal court system."

And in Berger v. New York, supra, at page 49, the court said:

"The law, though jealous of individual privacy, has not kept pace with these advances in scientific knowledge . . ." going on to quote from Boyd v. United States, 116 U. S. 616, 630 (1886), that "The principles laid down in this opinion [with respect to the Fourth Amendment's prohibition of unreasonable searches and seizures] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case . . . they apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the privacies of life."

Having thus established that a conversation was something that might be seized, the court had to consider when the seizure would be in violation of the

Fourth Amendment. The court's solution has been to apply to interceptions of conversations the same requirements applicable to seizures of papers and effects. An exact transposition of requirements has not been possible; for example, a potential eavesdropper cannot describe the conversation he expects to intercept with the same particularity that an officer planning a raid can describe the narcotics he expects to find. However, the court has required a transposition as exact as the circumstances permit.

Thus, in Osborn v. United States, supra, the court upheld the admission into evidence of a tape recording of a conversation between defendant and an informer, when the recording device had been installed on the informer's person only after judicial authorization based upon an affidavit of probable cause. In Berger v. New York, supra, the court held invalid a New York statute that granted permission to eavesdrop with "no requirement for particularity in the warrant as to what specific crime has been or is being committed, nor 'the place to be searched,' or 'the person or things to be seized' as specifically required by the Fourth Amendment": Id. at page 56. In Katz v. United States, supra, an interception without a prior court order was held invalid by application of the rule that in cases involving the seizure of papers and effects a prior court order was excused only in "a few specifically established and well-delineated exceptions," (Id. at page 357, footnote omitted) as, for example, where the seizure was as the result of a search incident to an arrest, or justified as part of a "hot pursuit," or required because of danger to life: Id. at pages 357-58. Said the court:

"They [the Federal agents who had engaged in electronic surveillance of the telephone booth where the defendant placed calls transmitting wagering information] were not required, before commencing

the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate of all that had been seized. In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end. Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' Agnello v. United States, 269 U.S. 20, 33, for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . .' Wong Sun v. United States, 371 U.S. 471, 481-482. 'Over and over again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes.' United States v. Jeffers, 342 U.S. 48, 51, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment [footnote omitted] —subject only to a few specifically established and well-delineated exceptions [footnote omitted]:" Id. at pages 356-57.[12]

In Alderman v. United States, 394 U. S. 165 (1969), the court followed this reasoning one step further,

---

[12] For the most recent reaffirmation of the principle that the traditional rules of search and seizure apply to the seizure of a conversation, even without any physical invasion, see United States v. White, 39 L. W. 4387 (U.S., April 5, 1971).

applying to electronic interceptions the rules of standing developed in cases involving the seizure of papers and effects, and holding that a defendant had standing to object to the use against him of information obtained from the interception of his conversations, but not of another defendant's conversations. Said the court:

"The established principle is that suppression of the product of a Fourth Amendment violation can be successfully argued only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence": Id. at pages 171-72.

2. *What procedure should be followed in a case involving an interception by wiretapping or electronic surveillance?*

The answer to this question may be deduced in general terms from what has been said: In determining the validity of a seizure of a conversation, the same procedure should be followed as though the seizure had been of tangible objects. For example, if defendant was a party to the conversation, he will have standing to object to its use in evidence against him; if the objection is improperly overruled, on appeal a conviction may be set aside. See, e.g., Katz v. United States, supra. Certain difficulties, however, must be noted.

In the ordinary case, in which tangible objects have been seized, defendant will know that the seizure has occurred; he will have been present when the search was conducted, or if not, he will later notice that the objects are missing. Thus, he will be enabled to decide whether to move to object to the use of the objects as evidence against him. The essence of wiretapping and electronic surveillance, however, is that defendant will not know of the interception; the techniques

depend upon their secrecy.[13] Because of this secrecy, procedural situations have arisen that are not encountered in the ordinary search and seizure case. Three different situations may be supposed.

First, the police, without obtaining a prior court order, may engage in wiretapping or electronic surveillance but learn nothing on which they take any action. Presumably, the persons whose conversations have been intercepted will never learn of the interception and so no challenge with respect to it will ever be made.[14]

---

[13] In recognition of this fact, the court has permitted some departure from the rules developed in cases involving the seizure of tangible objects. Thus, in Osborn v. United States, supra, it was held that the eavesdropping officers, as distinguished from officers searching for tangible objects, did not have to announce their purpose, because "if Osborn had been told in advance that Federal officers intended to record his conversations, the point of making such recordings would obviously have been lost . . .": Katz v. United States, supra, at page 355, n. 16. Also, the nature of interception techniques may preclude the degree of particularity of description possible in a warrant for the seizure of tangible objects. Cf. Berger v. United States, supra, at page 57.

[14] There has been considerable comment on the undesirable effects of such undisclosed interception. See, e.g., A. Westin, Privacy and Freedom, 57-63 (1967). Evidently in response, the Congress has made unauthorized interception a serious crime, further providing for the recovery of civil damages by a person whose wire or oral communication is unlawfully intercepted, disclosed or used. Title III, Omnibus Crime Control and Safe Streets Act of 1968, P. L. 90-351, 82 Stat. 211, 213, 18 U.S.C. §§2511, 2520. And see Berger v. United States, supra, at page 47, n. 4, and 48, n. 5, collecting State statutes:

"In sum, it is fair to say that wiretapping on the whole is outlawed, except for permissive use by law enforcement officials in some States; while electronic eavesdropping is—save for seven States—permitted both officially and privately. And, in six of the seven States electronic eavesdropping ('bugging') is permissible on court order." Id. at pages 48-9.

Second, the police, without obtaining a prior court order, may engage in wiretapping or electronic surveillance with the result that a conversation, in itself incriminating, is intercepted. The prosecutor may then offer the tape recording of the interception in evidence against defendant at trial. This happened, e.g., in Katz v. United States, supra. In such a case, the court will be able, although belatedly, to apply the rules derived from the cases involving the seizure of tangible objects; for, since the contents of the interception will be known, it will be possible to determine whether defendant has standing to object to the interception, and if he does, whether the interception was lawful, and if it was, whether its contents are relevant to the prosecution.

Third, the police, without obtaining a prior court order, may engage in wiretapping or electronic surveillance with the result that a conversation is intercepted that is not incriminating in itself but that leads the police to evidence that is incriminating. For example, the intercepted conversation causes the police to conclude that there is contraband in defendant's home; accordingly, they obtain a search warrant, enter the home and find and seize the contraband, the prosecution later offering it in evidence against defendant at trial. At this point, at least three different situations, with differing procedural consequences, may arise.

If defendant had known that the contraband had been obtained as the result of an intercepted conversation, he might, on motion, have been able to have the contraband suppressed as tainted, for, just as in Wong Sun v. United States, supra, where the words spoken by Blackie Toy could not be used against him because

For the Pennsylvania law, see the Act of July 16, 1957, P. L. 956, (No. 411) sec. 1, 18 PS §3742, and Commonwealth v. McCoy, 442 Pa. 234, 275 A.2d 28 (March 18, 1971).

they were the fruit of an illegal invasion by the police of his house, so evidence that is the fruit of an illegal interception should not be used. Because the interception was secret, however, and was not itself offered in evidence, defendant could not know that it led to the seizure of the contraband. He might, however, find this out later. The procedure that should follow is illustrated by United States v. Schipani, 414 F.2d 1262 (2d Cir., 1969). There, it was discovered after the trial that defendant had been the subject of an electronic surveillance. The government thereupon conceded that a new trial must be awarded because "material evidence against [the defendant] was based in part on electronic surveillance": Id. at page 1264. Before the second trial, a suppression hearing was held. As a result, certain evidence admitted at the first trial was found to have been tainted and so was suppressed, the evidence at the second trial being confined to evidence determined not to have been tainted. Defendant was again convicted. Upon his appeal, the Court of Appeals found the evidence at the second trial sufficient to sustain the conviction. With respect to the suppression hearing, the court said:

"The evidence at the suppression hearing disclosed that the F.B.I. had been compiling information on [the defendant] since 1958 . . . The first information obtained by electronic surveillance was in 1961. . . . Although [the defendant] was not the subject of that electronic surveillance, nine conversations in which he participated and 27 others in which he was discussed or his name mentioned were electronically monitored . . .

"The district court properly examined all of the evidence in the first trial to determine whether all or only a part was tainted by the electronic surveillance, and whether any untainted portion was inde-

pendent of and distinguishable from that which was tainted. [Footnote, citing, inter alia, Wong Sun v. United States, supra, omitted.] After a full hearing the court, in a careful opinion, first recognized that 'evidence is admitted if it is obtained from an untainted "independent source" but excluded if it is obtained as the result of illegality'; that evidence discovered 'as a result of both legal and illegal leads' is inadmissible, even though 'the legal lead could itself probably have sufficed to uncover the evidence' (289 F.Supp. at p. 54); and that the Government is required to 'prove beyond a reasonable doubt that the evidence it introduced was legally obtained' (at p. 59).

"Applying the foregoing rules, the court [found some evidence to have been tainted, and some not to have been] . . .

"We approve the legal principles applied": Id. at pages 1265-66.

The second possible situation that may arise, in a case where an interception has not been disclosed at trial but may have resulted in taint, is illustrated by Alderman v. United States, supra. There, after defendants had been convicted, and while appeals were pending, defendants learned that they had been the subject of electronic surveillance, "which might have violated their Fourth Amendment rights and tainted their convictions": Id. at page 167.

The government admitted that one of defendant's conversations had been intercepted. It also admitted that the interception had been without prior court order.[15] In contrast to its action in United States v. Schipani, supra, however, the government would

---

[15] Although the government contended that prior approval by the Attorney General had been sufficient under the circumstances (Id. at page 394, n. 3), the court assumed for the purpose of the appeal that the interception had been unlawful.

not reveal to defendants the contents of the interception. The question, therefore, became: How was it to be determined whether the evidence offered against defendants had been the fruit of an unlawful interception and so had tainted their convictions?

The government's answer to this question was twofold: First, the government said, it had examined the interceptions, and none was "arguably relevant to this prosecution" (Id. at page 168); and second, the government suggested that if this statement of relevancy were not sufficient, the interceptions should "be subjected to an in camera inspection by the trial judge, who would then turn over to the [defendants] and their counsel only those materials arguably relevant to their prosecution": Id. at page 184.

The court rejected both of these answers and held instead that whether the interceptions had tainted the government's case must be determined in an adversary proceeding. Said the court:

"[S]urveillance records as to which any petitioner has standing to object should be turned over to him without being screened in camera by the trial judge. Admittedly, there may be much learned from an electronic surveillance which ultimately contributes nothing to probative evidence. But winnowing this material from those items which might have made a substantial contribution to the case against a petitioner is a task which should not be entrusted wholly to the court in the first instance. It might be otherwise if the trial judge had only to place the transcript or other record of the surveillance alongside the record evidence and compare the two for textual or substantive similarities. Even that assignment would be difficult enough for the trial judge to perform unaided. But a good deal more is involved. An apparently innocent phrase, a chance remark, a reference to what

appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances. Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the in camera judgment of the trial court to identify those records which might have contributed to the Government's case. [Footnote omitted.]

". . . [I]f the hearings are to be more than a formality and petitioners not left entirely to reliance on government testimony, there should be turned over to them the records of those overheard conversations which the Government was not entitled to use in building its case against them.

" . . .

"Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth Amendment exclusionary rule demands": Id. pages 182-84.

Accordingly, the court remanded to the district court ". . . for a hearing, findings, and conclusions (1) on the question whether with respect to any petitioner there was electronic surveillance which violated his Fourth Amendment rights, and (2) if there was such surveillance with respect to any petitioner, on the nature and relevance to his conviction of any

conversation which may have been overheard through that surveillance": Id. at page 186.

The court further directed that if the district court found no unlawful surveillance, or found unlawful surveillance but no taint, it should enter new judgments of convictions, but that if it found both unlawful surveillance and that the convictions had been tainted by the surveillance, it should order new trials: Id. at pages 186-87.[16]

Finally, the third possible situation that may arise, in a case where an interception has not been disclosed at trial but may have resulted in taint, is also illustrated by Alderman v. United States, supra. There, the reason the government assigned for its refusal to disclose to defendants the contents of the interceptions was its desire "to protect innocent third parties participating or referred to" in the conversations: Id. at page 168. Under these circumstances, the court

---

[16] Some disagreement has developed with respect to the procedure thus mandated. In United States v. United States District Court, — F.2d — (6th Cir., April 6, 1971), partly reported in 9 Cr. L. 2045 (April 21, 1971), the majority stated (Edwards, J.):

"We cannot agree with the dissent that Justice Stewart's concurring opinion in United States v. Giordano, 394 US 310, 313-15 (1969), in any way weakened the disclosure requirement of Alderman."

The full text of Justice Stewart's opinion makes it clear that the "preliminary determination" with which he was concerned was whether or not "any of the surveillances did violate the Fourth Amendment." This determination Justice Stewart held could be made by an in camera determination, as has been done in this case both by the district court and this court.

We believe that the Supreme Court has held that a defendant whose personal conversations have been illegally recorded is entitled to transcripts of the illegally recorded material without regard to whether a judge on inspection in camera might or might not be able to find relevancy: 9 Cr. L. at page 2046.

did not require disclosure.[17] It held, however, and the government conceded,[18] that "disclosure must be made even though attended by potential danger to the reputation or safety of third parties as to the national security—unless the United States would prefer dismissal of the case to disclosure of the information": Id. at page 181.

3. *What procedure should be followed in the present case?*

It is at once apparent that the present case differs from the cases that have been discussed, in particular Alderman v. United States, supra, and United States v. Schipani, supra, in involving a prosecution by the Commonwealth rather than by the Federal government. Whether this difference is significant will be discussed later; for the moment it will be convenient

---

[17] Similarly, the court did not require disclosure where a Federal agent, when appearing before a United States District Court in response to a subpoena duces tecum, refused to produce certain records of the Department of Justice: United States ex rel. Touhy v. Ragen, 340 U. S. 462 (1951). The agent relied on a Department of Justice order prohibiting any department officer or employe from divulging any department information except as the Attorney General or one of his assistants in his discretion permitted. The court held that the order was valid, and affirmed the Court of Appeals, which had reversed the district court's holding that the agent was in contempt. In the present case, Special Agent Doyle was also present in response to a subpoena duces tecum, and, in refusing to respond to certain questions, he relied on instructions from the Attorney General issued pursuant to a Department of Justice Regulation similar to the order cited in Touhy v. Ragen, supra.

[18] The concession being required by Jencks v. United States, 353 U. S. 657, 671-72 (1957); Roviaro v. United States, 353 U. S. 53, 61 (1957); United States v. Reynolds, 345 U. S. 1, 12 (1953); United States v. Coplon, 185 F.2d 629 (2d Cir., 1950); United States v. Andolshek, 142 F.2d 503, 506 (2d Cir., 1944); and cf. Dennis v. United States, 384 U. S. 855, 873 n. 20 (1966).

to assume that it does not exist, and to consider the prosecution here as though it were by the Federal government. On that assumption, what procedure should be followed when the government has declined to say whether any conversation to which one of defendants was a party was intercepted by wiretapping or electronic surveillance?

(a) *Should the court presume that no wiretapping or electronic surveillance occurred?*

In one recent decision, United States v. Covello, 410 F.2d 536 (2d Cir.), cert. denied, 396 U. S. 879 (1969), rehearing denied, 397 U. S. 929 (1970), it is indicated that the Omnibus Crime Control and Safe Streets Act of 1968, supra, "would seem to assure that a defendant would know before his trial whether his conversation had been intercepted by government agents and in most cases what the intercepted conversation contained": Page 548 n. 14.

In making this remark, the court apparently relied on 28 U.S.C. §§2510, 2520, which provide, inter alia, that interceptions without prior court approval are prohibited and provide both penalties against the violator and a civil remedy for damages for the person whose communications have been intercepted. Where there has been an application to a court to intercept any communication, notice of the application must be given to the parties named and to any others the court deems, in the interest of fairness, should be notified, within 90 days of the filing of the applications or of the end of the interception period in cases where the application is granted. There is also a provision requiring that no communication or evidence derived therefrom may be introduced into evidence in a judicial proceeding unless 10 days before the proceeding every party has received a copy of the applica-

tion and of the court order issued in response to the application.

If by referring to these provisions the court meant to suggest that since the passage of the Omnibus Crime Control and Safe Streets Act of 1968, supra, it may be presumed that an interception will be made in accordance with its requirements, this court is unable to follow the suggestion.

It is, unhappily, apparent from such cases as Alderman v. United States, supra, Katz v. United States, supra, and United States v. Schipani, supra, that government agents have engaged in electronic surveillance without first seeking a court order. Moreover, the Senate Committee on the Judiciary, in its Report on the Omnibus Crime Control and Safe Streets Act of 1967, has stated that "[t]here has been extensive wiretapping carried on without legal sanctions, and without the consent of any of the parties to the conversation. Electronic, mechanical, and other intercepting devices are being used to overhear oral conversations made in private, without the consent of any of the parties to such communications. The contents of these communications and evidence derived therefrom are being used by public and private parties as evidence in court and administrative proceedings . . . : S. Rep. No. 1097, 90th Cong., 2d Sess. 10 (1968).

And the committee also reported that the problem facing the individual citizen as a result of this widespread use of electronic surveillance may be characterized as follows:

"The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques

of surveillance . . . No longer is it possible, in short, for each man to retreat into his home and be left alone": (S. Rep. No. 1097, supra at page 67.)

Senator Long, of Missouri, and Senator Hart, of Michigan, as authors of the minority report, expressed even more strongly the concern over the widespread use of illegal electronic surveillance, by both State and Federal authorities:

"The subcommittee has encountered instance after instance where otherwise honest and decent law enforcement officials have dishonestly denied or withheld the fact that their investigations involved the use of wiretapping or bugging. In the last 2 years, we have been treated to the spectacle of the Solicitor General of the United States going before the Supreme Court to disclose that a number of convicted defendants had been the subject of electronic eavesdropping—a fact not disclosed to the Department of Justice until after that Department had obtained convictions . . .

"The subcommittee's investigations of criminal intelligence-gathering activities disclosed that almost every metropolitan police department and almost every major State has a bureau engaged exclusively in the collection of criminal—and political—intelligence . . . The number of files and the quantity of information gathered by these intelligence bureaus is appalling. . . . Much of this information has been obtained through illegal, unconstitutional, and unconscionable electronic eavesdropping.": S. Rep. No. 1097, supra, at pages 162, 164.

Finally, it is apparently the view of the Attorney General that despite the provisions of the Omnibus Crime Control and Safe Streets Act of 1968, supra, a government agent is not required to obtain a court order before engaging in electronic surveillance where,

in the judgment of the Attorney General, the surveillance is "necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government." See United States v. United States District Court, supra, 9 Cr. L. at 2045. The evidence regarding the SDS plan to bomb historical sites in Boston and Philadelphia suggests that the present case may have been regarded as a case involving domestic subversion. Thus, it cannot be presumed simply because of the passage of the Omnibus Crime Control and Safe Streets Act of 1968, supra, that no electronic surveillance occurred.

(b) *What burden of proof should be placed on defendants?*

The most straightforward way to determine whether wiretapping or electronic surveillance has occurred would seem to be simply to ask the government. This is what the Court of Appeals for the Second Circuit did in United States v. Covello, supra. There, defendant had asked "that the Government state whether there had been any electronic eavesdropping or wiretapping upon him by any Government agency" (id. at 548), also asking that if necessary the government be judicially directed to divulge this information: Id. The trial court ruled that "whether action was to be taken upon this request was a matter for the Government, in its discretion, to decide, and not a subject for a court order": Id. On appeal, however, the Court of Appeals considered it "unlikely that a defendant, on whom the burden of proof lies at a suppression hearing, might reasonably be able to uncover the existence of an electronic or wiretap surveillance other than by asking his adversary to tell him of it . . .": Id.

Accordingly, without "undertak[ing] the task of

evaluating the merits of the [trial court's] ruling," the court of appeals itself asked the Department of Justice to respond to defendant's inquiry, and the department did.

In the present case, the court has followed an intermediate course. It did permit defendants to ask the government whether, during a particular period, any conversation to which either defendant was a party had been intercepted; however, this permission was given only after defendants had shown that it would be reasonable to infer that there had been such an interception.

Apart from United States v. Covello, supra, the court has found no case considering what burden should be placed on a defendant who alleges wiretapping or electronic surveillance. If anyone may complain of the court's ruling, however, it would seem to be defendants, since the court imposed on them a heavier burden than the court of appeals imposed on defendant in United States v. Covello, supra. However, the court was concerned that its ruling not act to give defendants a "general right of discovery" (United States v. Evanchik, 413 F.2d 950, 953 (2d Cir., 1969)), for "[a] defendant has 'no right to rummage in government files'": United States v. DeSapio, 299 F.Supp. 436, 449 (S. D. N. Y., 1969), quoting Taglianetti v. United States, 394 U. S. 316, 317 (1969).

(c) *Have defendants carried their burden of proof?*

The evidence offered by defendants has been summarized and discussed earlier in this opinion, in the statement of the case, finding of fact and discussion of the finding of fact. As there appears, it is a reasonable inference that between January 1, 1969, and April 18, 1969, the Federal Bureau of Investigation, either by wiretapping or electronic surveillance, inter-

cepted conversations to which one of defendants was a party. It is now in order to consider the significance of this finding in light of the cases that have been discussed.

The assistant district attorney has argued that the finding is of no significance because he does not intend to offer at trial any evidence that he obtained by wiretapping or electronic surveillance, or even the evidence obtained from the Federal Bureau of Investigation regarding the SDS meeting in Boston at which it is said there was discussion of a plan to bomb historical sites in Boston and Philadelphia.

The assistant district attorney's statement is sufficient to ensure that there will not arise in the present case the situation that arose in Katz v. United States, supra, where, it will be recalled, the government offered in evidence an intercepted conversation in itself incriminating. His statement, however, is not sufficient to ensure that other situations equally proscribed will not arise.

For example: Suppose that the Federal Bureau of Investigation intercepted a telephone conversation on April 16th in which defendant Fraser discussed his plan to go to California to meet with representatives of the Black Panther Party. It is not enough for the assistant district attorney to say that he does not know of the interception, and does not intend to use it if it occurred. If it occurred, it may include evidence that would be relevant to the assistant district attorney's prosecution. Defendants are charged with having explosives with the intent to use them "unlawfully against the person or property of another": The Penal Code of June 24, 1939, P. L. 872, sec. 417, 18 PS §4417. Intention is a state of mind that must be inferred from a defendant's conduct, including what he says. Thus, evidence of what defendant Fraser

said, in discussing his plan to go to California, might be relevant, either in an inculpatory or exculpatory sense, as reflecting defendants' intentions regarding the explosives.

As another example: As observed in the discussion of the finding of fact, it is not only a reasonable inference that at least one of defendant Fraser's conversations regarding his plan to go to California was intercepted, sometime between April 16th and 20th; it is also a reasonable inference that there were earlier interceptions of conversations to which one of defendants was a party, sometime after the Philadelphia police initiated their surveillance of defendants but before defendants were arrested on April 8th.[19] Again, it is not enough for the assistant district attorney to say that he does not know of such interceptions, and does not intend to use them if they occurred. If they occurred, the search of defendants' apartment and the subsequent arrest of defendants might have been tainted under the principles applied in United States v. Schipani, supra, as, for example, might be the case if the informer who told Lieutenant Fencl that he had seen explosives in defendants' apartment first learned of the explosives from overhearing a wiretapped conversation.

Nor is the force of these examples diminished by the Attorney General's responses to the court, that none of the evidence furnished the Commonwealth by the Federal Bureau of Investigation "resulted from

[19] With respect to the fact, already noted in the discussion of the finding of fact, that wiretapping and electronic surveillance are by nature continuing techniques, *see also* the Omnibus Crime Control and Safe Streets Act of 1968, supra, which provides for periods of up to 30 days for authorized surveillance, with an extension of 30 days available upon reapplication to the court: 18 U.S.C. §2518(5).

any type of electronic surveillance or overhearings" of defendants, and that in obtaining the evidence about the Boston meeting, the Bureau "did not, either directly or indirectly, employ any wiretap or other electronic surveillance." In the first place, these responses do not refer to either of the examples that have been put; they refer only to the evidence given the Commonwealth by the Federal Bureau of Investigation. The Attorney General's responses do not say that the bureau does not have a tape of an intercepted conversation of defendant Fraser discussing his plan to go to California that may contain evidence relevant to defendants' intentions regarding the explosives; nor do the responses say that evidence, not given the Commonwealth by the bureau but obtained by the Commonwealth itself, may not be tainted because obtained as the result of an interception by the bureau of defendants' conversations sometime during the period that defendants were under police surveillance but before they were arrested. In the second place, even if it be assumed arguendo that the Attorney General's responses should be read as saying that the Federal Bureau of Investigation did not intercept any conversation containing anything relevant to the prosecution, either so far as defendants' intentions with respect to the explosives are concerned, or so far as concerns the possibility of taint, still the responses are insufficient, for, as Alderman v. United States, supra, has established, it is not for the Attorney General to decide upon relevance or taint, but for the court, and then only after an adversary hearing.

The examples that have been discussed may have no basis in fact; the court does not suggest that they have. There may have been no interceptions; or if there were, a hearing might show that nothing contained in the interceptions is relevant, or could

have tainted the Commonwealth's case. Nevertheless, the fact remains that on the basis óf defendants' evidence, it is a reasonable inference that there were interceptions. Thus, defendants have shown: that there may have been a violation of their rights under the Fourth Amendment, as those rights have finally been defined, after many decisions, in Katz v. United States, supra; and that in order to determine whether there was a violation, the procedures prescribed in Alderman v. United States, supra, and United States v. Schipani, supra, must be followed.

The only reason that the court has been obliged to resort to the use of examples is that the Attorney General's responses have precluded definite statement. Perhaps the Attorney General has refrained from responding, either that there were interceptions or that there were not, in the belief that the procedures mandated by Alderman v. United States, supra, and United States v. Schipani, supra, become applicable only when the government concedes that interceptions have occurred.[20] It is evident, however, that if the procedures could so easily be eluded, the strictures of Congress against unauthorized interceptions, in the Omnibus Crime Control and Safe Streets Act of 1968, supra, and the often repeated statements by the Supreme Court emphasizing the protection afforded by the Fourth Amendment to the sanctity of the indi-

---

[20] Cf. United States v. Covello, supra, where the court said that "The rules set forth in Alderman do not become operative unless there is an admission by the Government that a pertinent electronic eavesdropping had occurred": Id. at page 551.

Apart from the fact that this is dictum, since the government did advise the court regarding the occurrence of eavesdropping (it said there had been none), there is nothing to suggest that the court would have considered itself unable to proceed, had the government not responded to the court's question whether eavesdropping had occurred.

vidual, would be reduced to verbiage. A defendant's conversation might be intercepted without prior court order; the interception might taint the ensuing prosecution, or contain evidence relevant to it, and perhaps exculpating defendant; and yet, simply on the Attorney General declining to disclose the interception, by refusing either to concede or deny that it had occurred, the prosecution would be enabled to proceed.

This is not to suggest that the Attorney General would deliberately act so as to sanction a violation of the Fourth Amendment. However, the essence of the rule of law is that the individual entrusts his freedom to the processes of the court and not to the judgment of the prosecutor.

Accordingly, were this case a Federal prosecution, there can be no doubt of the outcome. The Attorney General would have had to make the election illustrated by the cases that have been discussed: Either he would have had to disclose to defendants the contents of the interceptions that it is reasonable to infer from the record occurred, whereupon procedures would ensue to determine whether the interceptions had been lawful, and, if not, whether they had tainted the prosecution, and whether they contained evidence relevant to the prosecution; or, if he chose not to disclose the contents of the interceptions, he would have had to suffer dismissal of the prosecution. The Attorney General having elected not to disclose, defendants' motion to quash the indictments would be granted.

4. *Is it significant that in the present case the prosecution is by the Commonwealth rather than by the Federal government?*

In Weeks v. United States, 232 U. S. 383 (1914), it was held that the effect of the Fourth Amendment was that nothing seized by any Federal agent in violation of the amendment could be admitted in any

Federal court. Otherwise, "the protection of the Fourth Amendment declaring [a citizen's] right to be secure against [unreasonable] searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.": Id. at page 393.

Since, however, the Fourth Amendment was regarded as applicable only to the Federal government, this decision did not affect the local police. In consequence, if, as was true in Weeks v. United States, supra, evidence had been seized by the local police, the Federal prosecutor could use the evidence even though the local police had seized it in a manner that would have been in violation of the Fourth Amendment had the seizure been by a Federal agent.

In Wolf v. Colorado, 338 U. S. 25 (1949), it was held, inter alia, that the Fourth Amendment's prohibition against unreasonable searches and seizures did apply to the States, and, hence, to the local police, the court finding that "[t]he security of one's privacy against arbitrary intrusion by the police . . . is . . . implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause": Id. at 27-8.

Thus, the foundation of Weeks v. United States, supra, that unreasonable State searches did not violate the Constitution, disappeared; and in recognition of this fact, in Elkins v. United States, 364 U. S. 206 (1960), it was held that a Federal prosecutor could not use evidence unlawfully seized by the local police.

In Mapp v. Ohio, 367 U. S. 643 (1961), it appeared that the Cleveland police had unlawfully seized evidence. The Supreme Court of Ohio held, however, that the evidence was, nevertheless, admissible in an Ohio court because in Wolf v. Colorado, supra,

although it had been held that the prohibitions of the Fourth Amendment did apply to local police, it had also been held that whether the evidence seized by local police should or should not be admitted in a State court should be decided according to State law, and under Ohio law the evidence was admissible. The Supreme Court of the United States thereupon over-ruled this aspect of Wolf v. Colorado, supra, holding that "all evidence obtained by searches and seizures in violation of the Constitution is . . . inadmissible in a state court": Id. at page 655.

Thus, the court finally eliminated "the double standard" that had been created by its decision in Weeks v. United States, supra, under which, in States such as Ohio, "federal officers . . . were . . . invited to and did, as our cases indicate, step across the street to the State's attorney with their unconstitutionally seized evidence. Prosecution on the basis of that evidence was then had in a state court in utter disregard of the unenforceable Fourth Amendment": Mapp v. Ohio, supra, at page 658.

It follows from these decisions that if a Federal agent intercepts a defendant's conversations, in viola-tion of the Fourth Amendment, any evidence obtained as a result of the interception is inadmissible not only in a Federal prosecution but also in any State prosecu-tion. This is simply another way of saying that the same relief must be given a defendant whether the prosecution is a Federal or a State prosecution.

In the usual case, the relief will be to grant a motion to suppress the evidence seized in violation of the Fourth Amendment. In the present case, that relief cannot be granted, the Attorney General having declined to disclose the conversations that it is reason-able to infer from the record were intercepted. This circumstance, however unusual, is unimportant.

Since in a Federal court, in view of the Attorney General's action, the prosecution would have to be dismissed, so must it be in this court.

The Commonwealth has complained that this result makes its ability to proceed contingent upon the action of the Attorney General, over whom it has no control. However, the factor of control is irrelevant. Neither does the Commonwealth have control over a Federal agent who seizes a tangible object in violation of the Fourth Amendment. Nevertheless, the Commonwealth may not offer the object in evidence. No distinction may be maintained because the subject of the seizure is not an object but a conversation. What is relevant is whether there has been a violation of the Fourth Amendment. If there has been, under Mapp v. Ohio, supra, the Federal government and the Commonwealth are alike bound.[21]

If, however, it is not significant as a matter of legal reasoning that in the present case the prosecution is by the Commonwealth rather than by the Federal government, it is, nevertheless, significant as a matter of equity; and although it is unusual in a criminal case to refer to equity, this is an unusual case.

In cases such as the Federal cases that have been discussed, the Attorney General knows that it is a prosecution for which he is responsible that will

---

[21] Defendants' counsel have argued that an independent ground for quashing the indictments is that the Attorney General has declined to answer whether any conversations between defendants and counsel were intercepted. The court has not considered it necessary to reach this issue. It may be noted, however, that with respect to such interceptions, there has been no showing such as defendants made with respect to interceptions of defendants' conversations up to April 18, 1969. Thus, it does not appear from the record even that defendants spoke to counsel over the telephone, much less, if they did, when and over what telephone.

proceed or be dismissed according to the response that he gives the court. In the present case, however, he may not have anticipated dismissal. It may be granted that it would seem that he should have; defendants' counsel made it plain during argument, which the Assistant United States Attorney heard, that if disclosure were not made, they intended to request dismissal. Even so, the issues presented were novel, and it might have seemed that, in view of the Commonwealth's announced intention to prosecute only on the basis of certain limited evidence, the distinction between the Federal government and the Commonwealth was sufficient to warrant the belief that the request for dismissal would be denied.

In the usual case, the fact that the outcome is uncertain is of no significance; each party must do the best he can to predict the outcome, and if his prediction proves to be in error, he will, nevertheless, be bound by the court's decision and will not be given a second chance. The reason for this finality is that, in the usual case, each party is able to decide what evidence should be offered for the record; thus, it is fair to hold him to whatever result the court concludes is required by the record, whether or not that result was anticipated. In the present case, this reason does not apply with the same force that it does in the usual case, for while the Commonwealth could control the record to the extent of deciding what witnesses it should call, it had no control over the Attorney General and, hence, over what Special Agent Doyle would testify. This might not matter, except for the fact that it is the special agent's testimony that has made the present case difficult.

While there can be no question that the special agent's testimony, particularly when placed in context with the rest of the record, warrants the inference

that interceptions, either by wiretapping or electronic surveillance, did occur, the fact remains that perhaps interceptions did not occur. And if they did not occur, defendants would have been discharged, not because their rights under the Fourth Amendment had been violated, but because the record contained an ambiguity that the Attorney General may not have anticipated or intended, or the significance of which he may not have recognized.

In these circumstances, the court has concluded that the Commonwealth should have the opportunity to transmit to the Attorney General a copy of the transcript of the hearing before the court, so that the Attorney General may examine it in the light of this opinion and decide whether to permit the special agent to expand his testimony by answering whether from January 1, 1969, to April 18, 1969, there were any interceptions of conversations to which one of defendants was a party.

## ORDER

And now, May 13, 1971:

(1) The Commonwealth is given leave within the next 20 days to confer with the Attorney General of the United States to determine whether in light of the opinion accompanying this order the Attorney General will permit testimony by an appropriate Federal agent with respect to whether from January 1, 1969, to April 18, 1969, there were any interceptions, by wiretapping or electronic surveillance, of one or more conversations to which one or both of defendants was a party;

(2) If within such time the Commonwealth advises the court by letter that the Attorney General will permit such testimony, the court will conduct further

proceedings in accordance with the opinion accompanying this order;

(3) If no such letter is submitted, defendants' motion to quash the indictments will upon motion to the court be granted.